J-A25037-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| KAITLYN M. TOMASOVICH | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| KATHLEEN G. TOMASOVICH | : | |
| | : | |
| Appellant | : | No. 349 MDA 2020 |

Appeal from the Order Entered January 22, 2020
In the Court of Common Pleas of Schuylkill County
Civil Division at No(s):  A-343-2019

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED FEBRUARY 23, 2021**

Appellant, Kathleen G. Tomasovich, appeals from the order entered in the Schuylkill County Court of Common Pleas, under the Protection from Abuse ("PFA") Act,[1] in favor of Appellee, Kaitlyn M. Tomasovich.  We affirm.

The trial court opinion set forth the relevant facts of this appeal as follows:

> On November 22, 2020, [Appellee] sought and procured a temporary PFA Order against her mother-in-law, [Appellant].  Both parties, as well as a witness for each party, testified at a hearing on January 22, 2020 before [the trial c]ourt.  At that hearing, [Appellee] testified that she and [Appellant's son], are currently embroiled in divorce and custody proceedings regarding…their 15-month-old daughter [("Child")].  [Appellant's son] currently lives with his mother ([Appellant]) and father, … who testified as a witness for [Appellant].  [Appellant's son] also lived with his parents during an earlier period of separation with

---

[1] 23 Pa.C.S.A. §§ 6101-6122.

[Appellee] during the summer of 2019. Since late May, 2019, when an earlier PFA action against [Appellant] in Carbon County was dismissed …, [Appellant], as testified by [Appellee], has engaged in the following conduct:

1) On August 15, 2019, [Appellee] and her husband were living in separate residences when [he] requested that [Appellee] come to his parents' home in Jim Thorpe to pick him up, along with his belongings, because he wanted to move out of his parents' home and reconcile with [Appellee]. As [Appellee] was helping her husband load his belongings in her car, "[Appellant] came out in a rage screaming that; take my ring off that I paid for, to: I didn't deserve to wear it; that I was stealing her son. Aggressive as hell, slamming my arm in the car door as I was helping [Appellant's son] load his stuff." [Appellee] suffered bruises and scratches from the slamming incident, but did not call the police, because she was reconciling with [Appellant's] son and decided to "let it go."

2) On October 9, 2019, [Appellee] was involved in a serious automobile accident when her brakes completely failed at a stoplight on her way to work. Her car collided with several other cars, and [Appellee], who had to be extracted from the car, sustained broken ribs, a concussion, and a blood clot in her leg. The collision caused [Appellee's] car to start on fire, and she suffered from smoke inhalation. In a threatening text a month later, [Appellant] implied responsibility for tampering with [Appellee's] car, indicating "I thought the car would kill you and I would be free of you and so would [my son.]"

3) [Appellant] engaged in repeated instances of harassment and stalking behavior directed at [Appellee]. [Appellant] made harassing phone calls to [Appellee] in the middle of the night. She followed [Appellee] to and from work, attempting to gain entrance to the premises and causing [Appellee's] boss to go outside the workplace to tell [Appellant] to leave. [Appellant] also showed up repeatedly at [Appellee's] home. In one instance, on November 20, 2019, [Appellant] began banging on the front door of [Appellee's] home at 10:00 p.m. screaming "where is her son. She can't get in touch with him. She [knows] I have him." [Appellant's son] was not inside the residence, and

[Appellee] called the police, who removed two people from the outside of the premises.

4) The next day, November 21, 2019, [Appellant] engaged in a series of threatening texts to [Appellee]. [Appellee], after receiving numerous inquiries from [Appellant] about the whereabouts of her son, sent [Appellant] a text asking her to stop messaging her. The resultant texting exchange, as read by [Appellee] from Exhibit 1, included the following:

• [Appellant]:    "I take her [(Appellee's daughter)] away from you. You are bad control mom. Not even a mom if it weren't for me."

• [Appellee]:    "[Appellant], I'm forwarding this to Hazelton Police Department. I can't deal with you. Please stop messaging me. This is the final warning."

• [Appellant]:    "Make me."

• [Appellee]:    "[Appellant], please just stop. It's bad enough [my daughter] doesn't have you in her life. You're old, [Appellant], I don't want to have you in jail. Please just be reasonable."

• [Appellant]:    "I thought the car[3] would kill you and I would be free of you and so would [my son]. But I guess I have to try harder next time. …"

[3] An investigation into brake tampering of [Appellee's] car was still ongoing at the time of the January 22, 2020 PFA hearing….

After numerous calls from [Appellant] asking where [her son] was and threatening [Appellee] that [Appellee's] "life will not be good if I don't surrender him," the following text exchange occurred, as memorialized in [Appellee's] Exhibit 2 and read by [Appellee]:

• [Appellee]:    "[Appellant], if you continue this pattern, I'm gonna have to involve law enforcement."

• [Appellant]:    "You [think] you're so smart. PFA didn't [stick] last time…. You think it will this time.

Stupid girl, give me my son you disgusting creature."

• [Appellee]: "[Appellant], this won't end well. Just please stop."

• [Appellant]: "You stop. Why didn't the car kill you and the Plan B[5] terminate. I'd have my [son still]."

• [Appellee]: "Excuse me."

• [Appellant]: "You know what I say, you are hard to kill. H-E"

[5] [Appellee] testified that Plan B is an "after pill" meant to terminate pregnancy. [Appellee] had previously been pregnant with twins from [Appellant's] son, a girl [(Child)], and her twin brother, who was lost during the pregnancy.

[Appellee] also presented the testimony of her mother…. [Appellee's mother] testified that she received "drunk" phone calls from [Appellant] at weird hours—including 1 o' clock in the morning—with threats regarding [Appellee]. [Appellee's mother] summarized the content of those calls as "[Appellee] needs to let go of [Appellant's son] and return [him] to her or that [Appellee] will pay; that she will get her baby boy back; she won't get away with stealing her baby. There have been numerous threats." Those calls included a threat that [Appellant] would burn [Appellee's] house down.

[Appellee's mother] corroborated [Appellee's] testimony that [Appellant] had been stalking [Appellee] at both her house and workplace in the months leading up to [Appellee's PFA] petition…. [Appellee's mother] testified she observed [Appellant] following [Appellee] to work, prompting [Appellee's mother], whose daughter expressed fear, to follow behind. [Appellee's mother] also observed [Appellant] drive past the front of [Appellee's] house.

Testifying on direct examination, [Appellant] denied sending [Appellee] the text messages depicted by Exhibits 1 and 2, stating "I try not to text her at all." [Appellant] denied slamming [Appellee's] arm in the car door, but curiously her

denials referenced an incident in May, not the incident in August testified to by [Appellee]. [Appellant] also categorically denied calling anyone and threatening to burn anyone's house down. When questioned about possible brake tampering, [Appellant] offered: "I don't even know what kind of car she has. I do not even know where she lives, until we received the paperwork stating about this PFA." [Appellant] also denied pounding on [Appellee's] front door and being escorted off the premises by the police.

On cross-examination, when asked if she ever contacted [Appellee], [Appellant] initially said no, but then hedged: "—not that I know of, that I can remember." [Appellant] allowed that she had contacted [Appellee's mother], sometimes "later at night," but that she never made any threats.

(Trial Court Opinion, filed April 7, 2020, at 2-6) (internal citations to record and some footnotes omitted).

At the conclusion of the January 22, 2020 hearing, the court granted Appellee's request for relief and entered a final PFA order, which is to remain in effect for three years. Appellant timely filed a notice of appeal on February 21, 2020. On February 28, 2020, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant timely filed her Rule 1925(b) statement on March 17, 2020.

Appellant now raises six issues for our review:

Did the trial court err as a matter of law by admitting without proper authentication two text messages allegedly sent by [Appellant]?

Did the court err as a matter of law by allowing [Appellee] to testify about the contents of text messages allegedly sent by [Appellant] prior to the November 21 text messages, instead of presenting the documents themselves, in contrast to the Best Evidence Rule?

Did the court abuse its discretion when it found that the November 21, 2019 text messages reasonably put [Appellee] in fear of imminent bodily harm?

Did the court abuse its discretion when it granted [Appellee] a final [PFA] order based upon a finding of "abuse," as defined by the [PFA] Act, even though [Appellee's] testimony indicated she, in fact, was not in fear of imminent bodily harm?

Did the trial court abuse its discretion when it held that [Appellant's] defense was prejudiced by mixing up the August 15, 2019 allegation regarding slamming a car door on [Appellee's] arm with a similar incident occurring on May 25, 2019?

Did the trial court abuse its discretion when it found the August 15, 2019 car door incident to be an independent basis for finding "abuse?"

(Appellant's Brief at 9-10).

"Our standard of review for PFA orders is well settled. In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion." **E.K. v. J.R.A.**, 237 A.3d 509, 519 (Pa.Super. 2020) (internal citation and quotation marks omitted).

The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, with the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

**Mescanti v. Mescanti**, 956 A.2d 1017, 1019 (Pa.Super. 2008) (quoting

- 6 -

*Custer v. Cochran*, 933 A.2d 1050, 1053-54 (Pa.Super. 2007) (*en banc*)).

In her first two issues,[2] Appellant claims a party seeking to admit text messages into evidence should, at a minimum, identify the actual phone number from which the text messages were sent. Once the proponent of such evidence establishes the number for the sending phone, Appellant contends a court should consider additional, circumstantial evidence to determine whether the messages are what the proponent claims. Here, Appellant complains Appellee failed to identify the phone number from which the November 21, 2019 text messages were sent. Appellant further complains that Appellee failed to confirm when the messages were sent, and Appellee failed to support her claim that the messages came from the regular number she uses to contact Appellant. Absent such information, Appellant emphasizes that "it is quite easy to fabricate a text message conversation by saving a telephone number under any name in a mobile phone's contact list and then sending fake texts to oneself." (Appellant's Brief at 28-29). On this record, Appellant also insists there is "no evidence indicating [she] was in possession of the mobile phone from which the texts were sent." (*Id.* at 30).

Appellant notes the trial court's reliance on Appellee's testimony that the messages at issue "were similar in voice, pattern, and content to texts she

---

[2] The argument section in Appellant's brief does not correspond with the order of issues set forth in the statement of questions presented. Consequently, we address Appellant's claims in the order that they appear in the statement of questions presented.

had received from [Appellant] over the last three years." (*Id.* at 31). Appellant avers that such analysis runs afoul of Pa.R.E. 901(b), because "the trial court itself should have determined if the November 21, 2019 and the prior text messages had similar voice, pattern, and content, not [Appellee]." (*Id.*) Moreover, Appellant argues that the court violated the "best evidence" rule, because it did not require Appellee to present prior messages from Appellant for the court to "[view] the actual words [of the prior messages] to determine if they had a similar 'voice, pattern, and content' as the November 21 texts." (*Id.* at 35). Appellant concludes Appellee did not properly authenticate the November 21, 2019 text messages, and the trial court abused its discretion by admitting the messages into evidence. We disagree.

"[T]he purpose of the [PFA Act] is to protect victims of domestic violence from the perpetrators of that type of abuse and to prevent domestic violence from occurring." *Diaz v. Nabiyev*, 235 A.3d 1270, 1272 (Pa.Super. 2020) (quoting *Ferko-Fox v. Fox*, 68 A.3d 917, 921 (Pa.Super. 2013)).

> Questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court and may be reversed on appeal only when a clear abuse of discretion was present. In *Snyder v. Snyder*, [629 A.2d 977 (Pa.Super. 1993)], the court held that a person filing a [PFA] petition will not be rigorously limited to the specific allegation of abuse found in the Petition. The court further held that in light of the purpose of the Act to prevent imminent harm to abused person(s), some flexibility must be allowed in the admission of evidence relating to past acts of abuse.

*Buchhalter v. Buchhalter*, 959 A.2d 1260, 1263 (Pa.Super. 2008) (quoting

- 8 -

*Raker v. Raker*, 847 A.2d 720, 726 (Pa.Super. 2004)) (some internal citations and quotation marks omitted). "In light of the protective purposes of the act, it [is] within the trial court's discretion to hear any relevant evidence that would assist it in its obligation to assess the [complainant]'s entitlement to and need for a protection from abuse order." *Diaz, supra* at 1273 (quoting *Miller on Behalf of Walker v. Walker*, 665 A.2d 1252, 1259 (Pa.Super. 1995)).

Pennsylvania Rule of Evidence 901 governs the authentication of evidence as follows:

**Rule 901.  Authenticating or Identifying Evidence**

**(a)  In General.**  Unless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.

**(b)  Examples.**  The following are examples only—not a complete list—of evidence that satisfies the requirement:

(1)  *Testimony of a Witness with Knowledge.* Testimony that an item is what it is claimed to be.

\*     \*     \*

(4)  *Distinctive Characteristics and the Like*.   The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.

Pa.R.E. 901(a), (b)(1), (4).[3]

"[E]-mails and text messages are documents and subject to the same requirements for authenticity as non-electronic documents generally." ***Commonwealth v. Koch***, 39 A.3d 996, 1004 (Pa.Super. 2011), *affirmed by an equally divided court,* 630 Pa. 374, 106 A.3d 705 (2014). ***See also Commonwealth v. Danzey***, 210 A.3d 333, 337-38 (Pa.Super. 2019), *appeal denied*, ___ Pa. ___, 219 A.3d 597 (2019) (explaining Pennsylvania appellate courts have also considered authentication of computerized instant messages

_____

[3] On May 20, 2020, the Pennsylvania Supreme Court announced the amendment of Rule 901(b) to include the following language:

> (11) *Digital Evidence.* To connect digital evidence with a person or entity:
>
> (A) direct evidence such as testimony of a person with personal knowledge; or
>
> (B) circumstantial evidence such as:
>
> (i) identifying content; or
>
> (ii) proof of ownership, possession, control, or access to a device or account at the relevant time when corroborated by circumstances indicating authorship.

***In Re: Order Approving the Amendment of Pa. Rule of Evid. 901***, No. 841, Supreme Court Rules Docket (Pa. May 20, 2020) (effective Oct. 1, 2020) (*per curiam*). The amended comment explains that "Digital evidence" includes text messages, and: "The proponent of digital evidence is not required to prove that no one else could be the author. Rather, the proponent must produce sufficient evidence to support a finding that a particular person or entity was the author." ***Id.***

and communications made on Facebook and other social media platforms).

> A document may be authenticated by direct proof, such as the testimony of a witness who saw the author sign the document, acknowledgment of execution by the signer, admission of authenticity by an adverse party, or proof that the document or its signature is in the purported author's handwriting. A document also may be authenticated by circumstantial evidence, a practice which is uniformly recognized as permissible.

> \* \* \*

> [T]he difficulty that frequently arises in e-mail and text message cases is establishing authorship. Often more than one person uses an e-mail address and accounts can be accessed without permission. In the majority of courts to have considered the question, the mere fact that an e-mail bears a particular e-mail address is inadequate to authenticate the identity of the author; typically, courts demand additional evidence.

*Koch, supra* at 1004 (internal citations and quotation marks omitted).

Instantly, Appellee testified that she filed her PFA petition based upon her receipt of text messages from Appellant at approximately 9:00 a.m. on November 21, 2019. (*See* N.T. PFA Hearing, 1/22/20, at 4-5). To provide context for the messages, Appellee explained that she was involved in an automobile accident on October 9, 2019. (*Id.* at 8). Specifically, the brakes on Appellee's vehicle failed, resulting in a multi-vehicle collision. (*Id.*) Appellant referenced this accident in the messages, writing "I thought the car would kill you and I would be free of you…but I guess I have to try harder next time." (*Id.* at 10-11). The messages also indicated that "life ain't gonna be good" for Appellee, and Appellant thought Appellee was "hard to kill." (*Id.*

at 12).

During Appellee's direct examination, Appellee's counsel presented her with printed copies of the messages. (*Id.* at 8-9). Upon receiving the copies, Appellee confirmed that they were the text messages that Appellant had sent to Appellee's mobile phone on November 21, 2019. (*Id.* at 9). Appellee testified that Appellant is listed as a contact in her mobile phone, and the messages were sent from the "normal number" Appellant utilizes. (*Id.* at 9-10). Further, Appellee stated that the messages at issue were similar to other "drunk and rambling" messages that Appellant had sent to her over the last three years.[4] (*Id.* at 5).

In addition to the text messages, Appellee explained that Appellant had engaged in other harassing behaviors. Appellant made phone calls to Appellee at odd hours. (*Id.* at 6). Appellant showed up at Appellee's residence uninvited and was "beating and banging" on Appellee's door at 10:00 p.m. on November 20, 2019. (*Id.* at 6-7). Although Appellee did not actually see Appellant outside her residence, Appellee knew it was Appellant because she heard her screaming about her son. (*Id.* at 7). Also in November 2019, Appellant followed Appellee to work, attempted to enter the premises, and left only after being confronted by Appellee's boss. (*Id.* at 6-7).

_____

[4] Although Appellee read the messages into the record, our inspection of the printed copies reveals spelling and grammatical errors that Appellee did not point out during her testimony. (*See* Appellee's Exhibits 1-2, submitted 1/22/19).

Appellee's mother's testimony confirmed Appellant's pattern of engaging in provocative behavior. Appellee's mother testified that she also received calls from Appellant in May and September 2019. (*Id.* at 30-31). During those phone calls Appellant indicated that Appellee "won't get away with stealing" her son. (*Id.*) Appellant also threatened to "burn the house down." (*Id.* at 31). Appellee's mother stated that these were "drunk calls," which occurred at "weird hours of the night." (*Id.*) Appellee's mother believed Appellant was drunk due to her "slurred words" during the phone calls. (*Id.* at 33).

Although Appellant objected to Appellee's authentication of the text messages, the trial court determined that Appellee properly established that Appellant sent the text messages. (*See* Trial Court Opinion at 16-21). We agree that sufficient circumstantial evidence supported the court's decision, including testimony that: 1) the content of the messages was similar to that of other messages and phone calls that Appellee and her mother had received from Appellant; 2) the messages were sent from the number associated with Appellant in the contacts list of Appellee's mobile phone; and 3) the messages were sent shortly after an incident where Appellant went to Appellee's residence demanding information about her son. *Compare Koch, supra* at 1005 (emphasizing detective's testimony regarding his transcription of text messages from defendant's cell phone was insufficient to authenticate defendant as author; Commonwealth did not present testimony from persons

who received messages, and messages did not include context clues tending to reveal sender's identity).

To the extent Appellant also complains that the court should have required Appellee to present prior messages from Appellant for comparative purposes, Appellant did not raise this specific objection at the PFA hearing and it is waived.[5]  ***See E.K., supra*** at 522 (reiterating that failure to make

---

[5] At the PFA hearing, Appellant's counsel raised one objection under the "best evidence" rule, after Appellee testified that she "received a bunch of text messages from" Appellant on November 21, 2019, which were similar to past messages from Appellant.  (N.T. PFA Hearing at 5).  Appellant's counsel stated: "I object, Your Honor to hearsay.  I know it is potentially an admission but also best evidence rule.  If we have the text messages on her phone, she should be showing them."  (***Id.***)  Significantly, Appellant's counsel did not clarify whether he sought production of the November 2019 messages or the prior messages.  The court overruled the objection, Appellee read the November 21, 2019 text messages into the record, and the court admitted the printed copies as exhibits without any further "best evidence" objections.  (***See id.*** at 36).

In her Rule 1925(b) statement, Appellant mentioned the "best evidence" rule in conjunction with her claim that "the [c]ourt allowed testimony by [Appellee] and unauthenticated text messages from [Appellant], which provided no information from the sender such as date, time, or phone number purportedly sending the messages."  (Rule 1925(b) Statement, filed 3/17/20, at 1).  In its opinion, the trial court interpreted Appellant's "best evidence" argument as pertaining to the November 21, 2019 text messages.  The court concluded that it allowed Appellee to lay an appropriate foundation for the November 21, 2019 text messages with her testimony before she read the messages into the record.  (***See*** Trial Court Opinion at 19).

Now, Appellant attempts to refine her argument on appeal, claiming Appellee should have submitted copies of Appellant's text messages from prior to November 21, 2019.  In light of the lack of specificity in Appellant's original "best evidence" objection at the PFA hearing, we cannot say Appellant has preserved the current argument she seeks to advance on appeal.

contemporaneous specific objection at PFA hearing results in waiver of issue on appeal). Based upon the foregoing, the trial court did not abuse its discretion by admitting Appellant's text messages into evidence. *See Buchhalter, supra*. Thus, Appellant is not entitled to relief on her first two issues.

In her third and fourth issues, Appellant contends Appellee's evidence did not establish that she needed protection from an immediate prospective physical harm, which is the primary purpose of the PFA Act. Regarding the November 21, 2019 text messages, Appellant argues the messages merely reveal the parties' toxic relationship, and they do not convey any threats of imminent physical harm. Appellant concludes Appellee presented insufficient evidence to establish "abuse" under the PFA Act. Appellant's claim is waived.

As a prefatory matter, we must consider whether Appellant has preserved these claims for our review. *See* Pa.R.A.P. 1925(b)(4)(vii).

> In *Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306 (1998), our Supreme Court held that from this date forward, in order to preserve their claims for appellate review, [a]ppellants must comply whenever the trial court orders them to file a Statement of Matters Complained of on Appeal pursuant to Rule 1925. Any issues not raised in a 1925(b) statement will be deemed waived. This Court has held that [o]ur Supreme Court intended the holding in *Lord* to operate as a bright-line rule, such that failure to comply with the minimal requirements of Pa.R.A.P. 1925(b) will result in automatic waiver of the issues raised.

*U.S. Bank, N.A. for Certificateholders of LXS 2007-7N Tr. Fund v. Hua*, 193 A.3d 994, 996-97 (Pa.Super. 2018) (some internal citations and quotation

marks omitted).

Here, Appellant's Rule 1925(b) statement did not include any claims regarding the sufficiency of the evidence to establish "abuse" under the PFA Act.[6]  Therefore, Appellant's third and fourth issues are waived.  **See id.**

In her fifth issue, Appellant maintains Appellee's own testimony was the only evidence that Appellant slammed a car door on Appellee's arm on August 15, 2019.  Appellant complains the trial court seemed to credit Appellee's testimony simply because Appellant failed to present countervailing testimony.  Appellant acknowledges that during the PFA hearing, she and her husband both confused the August 2019 incident with a similar incident that occurred in May 2019.  Appellant insists, however, that such confusion was understandable where both incidents involved allegations that Appellant "slammed a car door on [Appellee's] arm while [Appellee's] husband was

_____

[6] Appellant presented the following claims in her Rule 1925(b) statement: 1) the court violated the principles of *res judicata* where a jurist in Carbon County had already adjudicated the same claims; 2) the court erred by admitting the unauthenticated text messages into evidence; 3) the court failed to give proper weight to the fact that Appellee did not contact the police or have police reports regarding the alleged incidents, and Appellee did not personally witness Appellant "banging on her door" on the night of November 20, 2019; 4) the court erred in finding Appellee's testimony credible; 5) the court erred in failing to consider that Appellee pursued a PFA order as a tactic to gain an advantage in her pending custody matter; 5) the court failed to give proper weight to Appellee's prior, unsuccessful PFA petitions against Appellant; 6) the court failed to give proper weight to the fact that Appellant cannot work in her chosen field as long as the PFA order is in place; and 6) the court abused its discretion by issuing a PFA order with a three-year duration.  (**See** Rule 1925(b) statement at 1-2).

moving from one house to another." (Appellant's Brief at 41). Under these circumstances, Appellant concludes the trial court's decision to credit Appellee's testimony was unreasonable. We disagree.

"Assessing the [c]redibility of witnesses and the weight to be accorded to their testimony is within the exclusive province of the trial court as the fact finder." **S.G. v. R.G.**, 233 A.3d 903, 907 (Pa.Super. 2020) (quoting **S.W. v. S.F.**, 196 A.3d 224, 230 (Pa.Super. 2018)). "In reviewing the validity of a PFA order, this Court must … defer to the [trial] court's determination of the credibility of witnesses at the hearing." **C.H.L. v. W.D.L.**, 214 A.3d 1272, 1276-77 (Pa.Super. 2019).

Instantly, Appellee unambiguously testified that Appellant slammed her arm with a car door:

> [COUNSEL:] You indicated she slammed your arm in a car door?
>
> [APPELLEE:] Yes.
>
> [COUNSEL:] When was that?
>
> [APPELLEE:] She did it twice. The first time was first PFA, the one that got dismissed. The second time she had done it is when [Appellant's son] decided to come back home. Back in August he decided to come back to his marriage.
>
> [COUNSEL:] In 2019?
>
> [APPELLEE:] Yes. I went to her residence with [her son] for [him] to get his belongings. She got in my face. She told me to take my ring off, that I didn't deserve to wear it. She slammed my arm in the car door causing bruises and scratches. …

(N.T. PFA Hearing at 15-16).

Regardless of any confusion Appellant and her husband might have had when testifying about these incidents, the trial court was free to credit Appellee's own testimony. **See S.G., supra**. Because the record supports the court's credibility determination, we defer to it. **See C.H.L., supra**. Therefore, Appellant is not entitled to relief on her fifth issue.

In her final claim, Appellant asserts the trial court erred by finding that the August 15, 2019 "car door incident" constituted an independent basis for a finding of "abuse" under the PFA Act. (**See** Appellant's Brief at 44-48). Again, Appellant failed to include this specific claim in her Rule 1925(b) statement, and it is waived. **See Hua, supra**. Accordingly, we affirm the PFA order entered against Appellant.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/23/2021